Ostrau, P. J.
(dissenting). I respectfully dissent and would reverse the order appealed from and reinstate the petition in this nonpayment proceeding.
By virtue, inter alia, of the acute housing shortage in this city, residential tenants, particularly during the 1970’s, gravitated to space available in commercial loft buildings. Many of these "loft tenants” entered into conventional commercial loft leases which were little more than contrivances calculated to disguise the residential use to be made of the premises.
Multiple Dwelling Law §§ 301 and 302 forbid an owner from recovering rent from tenants of a multiple dwelling which lacks a valid certificate of occupancy. In Lipkis v Pikus (99 Misc 2d 518 [App Term, 1st Dept, Riccobono, J., dissenting opn], affd 72 AD2d 697, lv denied 51 NY2d 874), the Appellate Term, First Department, confronted some of the anomalies arising from the residential use of commercial loft premises. Recognizing that landlords and tenants had to some extent acted in concert in unlawfully converting commercial loft premises to residential use, the Appellate Term majority reversed the dismissal of nonpayment proceedings not withstanding tenants’ assertion and proof that the premises there at issue lacked valid residential certificates of occupancy. Indeed, in Lipkis, the Appellate Term majority (in spite of the proscription of Multiple Dwelling Law §§ 301 and 302 against a landlord’s recovering of rent from tenants of a multiple dwelling lacking a valid certificate of occupancy) awarded final judgment in favor of the landlord, stayed that judgment until *319 such time as the landlord obtained valid certificates of occupancy, and directed the tenants to deposit with the clerk of the court of original jurisdiction any and all arrears in rent as well as accruing use and occupancy at the rate previously payable as rent, with those funds to be released to the landlord upon his securing residential certificates of occupancy. In so doing, the Appellate Term majority observed: "The pervasive extent of the problem confronting us is best illustrated by a report of the Department of City Planning (received in evidence) indicating that fewer than 10% of the industrial buildings located in Manhattan which have undergone total or partial conversion have valid certificates of occupancy for residential use. It seems obvious that the Multiple Dwelling Law provision under review did not envision a situation involving wholesale conversion of commercial properties precipitated by shifting patterns of industrial use and a resurgent demand for mixed residential/commercial space. In this context, we are not persuaded that the implicit condonation of widespread rent withholding actions, or 'strikes’, is the most feasible and equitable alternative to bring converted properties within the applicable multiple dwelling guidelines. That goal would be better achieved by the more stringent enforcement of building and zoning standards by the appropriate city agencies. In our discretion, however, we have conditioned enforcement of the final judgment granted herein upon petitioner’s procurement of the requisite certificate of occupancy. We view this relief as giving balance to the competing interests of both parties by avoiding unjust enrichment to the tenants and stimulating expeditious completion of the actions necessary to legalize the conversion.” (Lipkis v Pikus, 99 Misc 2d 518, 520-521 [App Term, 1st Dept], supra.)
The Appellate Term’s formulation in the Lipkis case (supra) has been superseded by the passage of article 7-C of the Multiple Dwelling Law (§§ 280-287; L 1982, ch 349, § 1). Multiple Dwelling Law § 280 characterizes the public emergency giving rise to the enactment of Multiple Dwelling Law article 7-C, and further provides: "the intervention of the state and local governments is necessary to effectuate legalization * * * of the present illegal living arrangements in such 'de facto’ multiple dwellings, and to establish a system whereby residential rentals can be reasonably adjusted so that residential tenants can assist in paying the cost of such legalization without being forced to relocate; that in order to prevent uncertainty, hardship, and dislocation, the provisions of this *320 article are necessary and designed to protect the public health, safety and general welfare.”
To maintain existing rent rolls of interim multiple dwellings, Multiple Dwelling Law §285 (1) was promulgated to provide: "Notwithstanding the provisions of section three hundred two or three hundred twenty-five of this chapter, the owner of an interim multiple dwelling may recover rent payable from residential occupants qualified for the protection of this article on or after April first, nineteen hundred eighty, and maintain an action or proceeding for possession of such premises for non-payment of rent, provided that he is in compliance with this article” (emphasis added).
The instant proceeding was dismissed by the court of original jurisdiction upon the ground that notwithstanding the issuance of an interim multiple dwelling registration number for the premises, the landlord was not in "compliance” with Multiple Dwelling Law article 7-C. Multiple Dwelling Law § 284 provides, inter alia, a schedule for owners of interim multiple dwellings to legalize their premises. Admittedly, the landlord in the instant proceeding has failed to meet the statutory schedule for securing a residential certificate of occupancy for the premises, and because of that failure the court of original jurisdiction concluded that the landlord is not in "compliance” with Multiple Dwelling Law article 7-C and thus not entitled to maintain this nonpayment proceeding against the tenant (Multiple Dwelling Law § 285 [1]).
However, to so strictly construe Multiple Dwelling Law § 285 (1) is to ignore the ramifications of Multiple Dwelling Law § 282, wherein the Legislature provided for the creation of a "loft board” to assume jurisdiction over the myriad complexities which confront landlords of loft premises in meeting their obligation to secure residential certificates of occupancy for their premises. Very few interim multiple dwellings in this city have been legalized, and of those few that have been legalized, most are cooperative premises in which the proprietary’s lessees have had an obvious economic incentive to undertake such legalization.
The simple fact of the matter is that the Appellate Term majority, in affirming the dismissal of this nonpayment proceeding, has now jeopardized the rent roll of almost every interim multiple dwelling in this city. The majority’s holding in this case is manifestly more restrictive than even the Appellate Term’s earlier formulation in the Lipkis case (su *321 jora), and it raises the specter of bankruptcy for most interim multiple dwellings. To my view, the majority’s holding represents an overly restrictive construction of article 7-C, particularly since article 7-C is primarily designed to guarantee the rent roll so necessary if services are to be provided and if the orderly legalization of interim multiple dwellings is to proceed. It is most significant that the Loft Board itself, with its broad powers to regulate interim multiple dwellings, has not suggested that the tenants of the interim multiple dwellings which have not been legalized in accordance with the schedule provided by Multiple Dwelling Law § 284 (1) which as indicated above constitute the vast majority of interim multiple dwellings in this city are now completely relieved of the obligation to pay rent.
The tenant in this proceeding has not suggested that the landlord has failed to provide services or that the premises have deteriorated. To my view, and in the absence of a determination by the Loft Board to the contrary, the landlord is entitled to recover rent for the premises at issue and to maintain this nonpayment proceeding (cf., Corris v 129 Front Co., 85 AD2d 176 [Sandler, J., dissenting in part]). To suggest, as does the majority, that the answers to the immediate questions raised by this appeal are to be found in the Legislature, is to defer to the problematic, to defy experience and to afford no relief for the significant dislocation which the majority’s holding will most certainly cause.
Sandifer and McCooe, JJ., concur; Ostrau, P. J., dissents in a separate memorandum.